# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | Cr. No. 03:06-cr-64 (CFD) |
| | : | |
| DENNIS PARIS, et al. | : | |
| | : | |

## RULING ON POST-TRIAL MOTIONS

Defendant Dennis Paris has moved the Court under Fed. R. Crim. P. 29 (hereafter, "Rule 29 Motion") to set aside the jury's guilty verdict as to all twenty-one counts of the Second Superseding Indictment,[1] or, in the alternative, to grant a new trial under Fed. R. Crim. P. 33 (hereafter, "Rule 33 Motion").

I.    Background

Paris was convicted of twenty-one counts associated with the operation of a prostitution business in the Hartford, Connecticut area. Count One charged Paris with conspiring with Brian Forbes and Shanaya Hicks and "others known and unknown to the Grand Jury" to use cellular telephones to operate a business enterprise involving prostitution in violation of 18 U.S.C. § 371. Count Two charged Paris with sex trafficking of Eileen K.,[2] a minor, in violation of 18 U.S.C. § 1591. Count Four charged Paris with the sex trafficking of Marianne C., a minor, in violation of

---

[1] The indictment originally contained twenty-two counts against Paris, but on June 11, 2007 the Court granted the Government's oral motion to dismiss Count Thirteen, which charged Paris with use of an interstate facility to promote prostitution in violation of 18 U.S.C. § 1952.

[2] In order to protect the identities of the victim-witnesses, the Court granted the Gvernment's motion to refer to these women by their first names and the first initial of their last names. See Dkt. # 480.

18 U.S.C. § 1591.  Count Nine charged Paris with sex trafficking of Jennifer D. by fraud, force,

or coercion in violation of 18 U.S.C. § 1591.  Count Ten charged Paris with sex trafficking of

Melissa P. by fraud, force, or coercion in violation of 18 U.S.C. § 1591.  Counts Eleven, Twelve,

and Fourteen through Twenty-one charged Paris with use of cellular telephones to promote,

manage, and carry on a prostitution business in violation of 18 U.S.C. § 1952.  Counts Twenty-

two through Twenty-four charged Paris with accepting credit card charges as payment for

prostitution services in violation of 18 U.S.C. § 1952.  Counts Twenty-five through Twenty-

seven charged Paris with money laundering in violation of 18 U.S.C. § 1956.[3]

II.     Rule 29 Motion

        A.      Standard

        In deciding a motion for judgment of acquittal, the Court views the evidence presented in

the light most favorable to the Government, and draws all reasonable inferences in the

Government's favor. United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000).  The evidence

must be considered in its totality, not in isolation, and the Government need not negate every

theory of innocence.  Id.  The Court must be careful to avoid "usurping the role of the jury," id.

(quoting United States v.Guadagna, 183 F.3d 122, 129 (2d Cir. 1999)), and accordingly may not

substitute its own determinations of credibility or relative weight of the evidence for that of the

---

[3] Forbes and Hicks were charged in the Second Superceding Indictment with conspiracy in Count One, sex trafficking of a minor in Counts Three, Five and Six, and sex trafficking by force, fraud or coercion in Counts Seven and Eight.  Forbes was also charged with violation of the Mann Act in Counts Twenty-eight and Twenty-nine.  Forbes pled guilty to Counts One, Three, Five, Six, Seven and Eight prior to trial.  Hicks pled guilty to Counts One, Five, Six, Seven and Eight.  Under the terms of their plea agreements with the Government, the Government will move to dismiss the remaining counts pending against these defendants at sentencing.

jury. Autuori, 212 F.3d at 114. The Court "must determine whether upon the evidence, giving

full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable

inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." Id.

(quoting United States v. Mariani, 725 F.2d 862, 865 (2d Cir.1984)). If the Court concludes that

either a verdict of guilty or not guilty was possible based on the evidence, it must uphold the

jury's guilty verdict. See Autuori, 212 F.3d at 114. Put another way, the Court may "not disturb

a conviction on grounds of legal insufficiency of the evidence at trial if any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt." United States

v. Pimentel, 346 F.3d 285, 295 (2d Cir.2003) (internal quotation marks and citations omitted).

      B.      <u>Evidence Presented at Trial</u>

          1.      <u>Eileen K.</u>

Eileen testified that she worked for Paris as a prostitute for about two weeks in March

2002, when she was sixteen years old. Eileen also testified that she told Paris her age and that

she was still in high school. Paris told her to tell customers that she was nineteen.

According to Eileen, she was introduced to Paris by her friend Marianne C., who had

worked for Paris in the past. Paris arranged for "in calls" in her motel room as well as "out calls"

at the customer's location. Paris paid her a portion of the funds given to him by the customers.

Paris used a cell phone to set up the calls.

According to Eileen, Marianne stopped working for Paris in June 2001, but started

working for him again shortly after Eileen began working for Paris. Eileen also testified that she

and Marianne did a "call" together on at least one occasion when both were working for Paris.

According to Eileen, Corrine L. was another high school friend of hers who also worked

for Paris. However, Corrine later testified that she worked for Forbes rather than Paris. At trial, Eileen identified Paris and a photograph of Forbes.

        2.    <u>Marianne C.</u>

Marianne testified that she met Paris when she was fourteen years old and living with friends. At that time, she understood that Paris would provide her with work, but Marianne did not know the nature of the work. Paris took Marianne to a Days Inn in Hartford, Connecticut and explained that her work would be to go on "dates" with men. According to Marianne, Paris then showed her what a "date" would entail by instructing her to disrobe and dance, and then had sexual intercourse with her. At age fourteen, Marianne was "somewhat developed" physically.

After that first session with Paris, Marianne worked for Paris by having sexual intercourse with Paris's customers. She would perform in calls and out calls for Paris, two to three times a day. Of the $120 Paris collected for the calls, Marianne was paid $80 by Paris. She performed approximately 100 calls for Paris, and he provided her with condoms. Paris advertised for Marianne in a local newspaper and referred to her as "Sasha" in the advertisements. According to Marianne, she continued working intermittently for Paris for one and a half years until about June 2001.[4]

Marianne confirmed that Eileen had worked for Paris and that she had introduced Eileen to Paris. Marianne also testified that she and Eileen did a call together for Paris.

While she was working for Paris, Paris bought Marianne cigarettes. Paris never asked Marianne to see her identification. During this time, Marianne used a false New Jersey

_____

[4] This date is inconsistent with Eileen's testimony that both she and Marianne worked for Paris in March 2002. However, the jury could have found this discrepancy immaterial.

identification card to enter 21-and-older clubs and to obtain a tattoo.

### 3. Jennifer D.

Jennifer D. testified that she left her home in Vermont in the fall of 2003 to live with her aunt in Hartford. At that time, Jennifer was eighteen years old and addicted to heroin. Shortly after she moved to Hartford, Jennifer was introduced to Forbes by her aunt, and went to live with him. Forbes provided Jennifer with heroin and Jennifer testified that, at first, she was happy living with Forbes. Jennifer asked her friend Melissa P. to come down from New Hampshire and live with them. Forbes picked Melissa up in New Hampshire.

Jennifer testified that Forbes had Jennifer and Melissa work as prostitutes for him. He and Shanaya Hicks would take them to calls. Forbes provided condoms to them. According to Jennifer, Forbes would yell at and hit Melissa and Jennifer. Jennifer testified that Forbes kept them locked in a bedroom guarded by his girlfriend Shanaya Hicks when he was out.

According to Jennifer, at some point Forbes introduced Paris to Jennifer and Melissa. Jennifer testified that Paris had Jennifer and Melissa disrobe and took their measurements and photographed them. According to Jennifer's testimony, she and Melissa were introduced to Paris so that Paris could arrange calls for them for Forbes's benefit.

In late 2003, Jennifer was given the choice to leave Forbes to go work for Paris. She chose to work for Paris because "it was so bad [with Forbes] that anything else would be better." Jennifer testified that Forbes was angry that she and Melissa were leaving, and that Paris offered to pay him $1200 before they left.

At first, Jennifer was happy working for Paris. Paris provided Jennifer with heroin and condoms. She was given money for doing "calls" and was allowed to go shopping and out to

restaurants.  Jennifer testified that during this period "you felt like you were free."

According to Jennifer, as time went on she started receiving less money from Paris for her calls.  If she refused to do a call, Paris would also refuse to provide her with heroin.  Jennifer testified that when Paris withheld heroin "it feels like you get the flu but wors[e].  You have chills.  Every bone and joint in your body aches.  Your skin crawls.  You can't hold your bowel movements or anything."  She testified that after feeling this way she would do the call if Paris provided her with heroin.  Jennifer also testified that Paris had sex with her many times.  She testified that she did not want to have sex with Paris, but that she did not feel that she could refuse him because she did not want to be "dope sick."

On one occasion, Paris struck Jennifer in the face, causing her to break a tooth.  According to Jennifer, Paris struck her during an argument that resulted when she refused to do a call.  Paris later testified that the reasons for the fight were different.

Jennifer testified that a time came when she felt that she could not leave Paris because she was scared and "didn't know what was going to happen."  Paris used cell phones to arrange her calls.

4.     Melissa P.

Melissa P. confirmed that Jennifer and Forbes brought her down to Hartford from New Hampshire, and that both of them first worked as prostitutes for Forbes.  Melissa shared a room with Jennifer at Forbes' apartment.  According to Melissa, Forbes promised that drugs would be available to them at any time.  Melissa did two to three calls per day at Forbes' apartment.  Melissa testified that she asked Brian to let her go home and he refused.  Melissa then refused to have sex for money.  In response, Forbes "started forcing himself on [Melissa].  So it got

physical after that." If "Melissa and Jennifer weren't working to the standards that [Forbes] wanted" he would withhold heroin from them, but still require them to work. According to Jennifer, Forbes also locked Jennifer and Melissa into the room that they shared in his apartment.

Melissa testified that Forbes told her that "we would eventually be meeting up with [Paris]." Then, Forbes brought Melissa and Jennifer to Paris. According to Jennifer, Paris had the girls undress and wrote down descriptions of their bodies. A few weeks later, Melissa and Jennifer started doing calls for both Forbes and Paris. Melissa testified that at this point Forbes and Paris were sharing Melissa and Jennifer. According to Melissa, during the time when she was selling sex for money for both Forbes and Paris, she was still locked in Forbes's house, and Forbes was still assaulting her. Melissa testified that she talked to Paris and told him that Forbes was beating, choking, and raping her. According to Melissa, Paris and Forbes talked to each other on cellular telephones during this period to arrange for the girls to do calls for Paris.

At some point, Paris told Forbes that he was going to take Jennifer away and said that he would also take Melissa if she wanted to come with him. Paris promised Melissa that she would be provided with money and drugs if she came with him, and that he would not physically abuse her. Melissa testified that she decided to go work for Paris. Later, Paris told Melissa that she and Jennifer "weren't worth the money he paid."

According to Melissa, Paris provided her with heroin while she was working for him. Melissa testified that Paris would tell her whether a customer wanted oral sex, intercourse, or both, and that he would provide her with condoms.[5] Melissa also testified that "[i]f we didn't want to do the call we still had to." In particular, she testified that one customer requested anal

---

[5] Melissa also testified that there was at least one customer who did not want sex.

sex.  Melissa called Paris to say that she did not want to provide anal sex.  Paris directed her to do the call anyway.  Melissa typically performed six to seven calls per day for Paris.

Melissa testified that on one occasion, Melissa was arrested and called Paris.  Paris arranged for Ron Martinez, another pimp who also worked as a bail bondsman, to post bail for Melissa.

Melissa testified that she and Jennifer went home to Vermont and New Hampshire at Christmastime in 2003.  When they returned the other women who had worked for Paris were gone.  After this, Paris began to treat Melissa and Jennifer differently and stopped paying them the full amounts they had earned.

Melissa testified that Paris hit her on two occasions.  One time a customer refused to see Melissa because she was too pale.  In response, Paris hit Melissa and took her to a tanning salon.  Melissa testified that this incident caused her to feel less able to leave Paris: "before it was just verbal, like, threats . . . and I didn't feel I could walk away and I didn't want to risk it, but now I knew that it had reached a different level.  Like if I did leave, then what would he do if he caught me trying to leave." After Melissa left the tanning salon, the man operating the salon called Paris to arrange a session with Melissa.  The session was painful for Melissa and she called Paris to say that she could not handle the session.  Paris directed her continue.  Melissa testified that the session caused "ripping and bleeding" but that she and Paris "immediately went to another call" afterwards.

On a second occasion, Melissa testified that Paris was angry with her because she had taken photographs from him and Paris believed that Melissa had reported him to the police.  Melissa testified that Paris raped her, handcuffed her, wrapped her in a blanket, called for heroin

from another person, and told Melissa that "he was going to get rid of me." Paris then took Melissa's identification and left with Barry Perez, a friend of Melissa's. Melissa testified that "I just made myself deal with the fact that I was going to die." When Paris and Perez returned, Paris had food with him, was laughing and acting "[l]ike it didn't even happen." Melissa was allowed to leave the room. She went back to her own hotel room and called her mother. She told her mother "I don't know what I just got myself into. . . I can't come home. I'm scared." Melissa testified that she told her mother that she did not want to go home because she was afraid that Paris knew where she lived and that he might harm her younger siblings if she left him.[6]

On another occasion, Melissa witnessed Paris assault another woman at a "stag party." Melissa testified that the woman "started getting mouthy" and Paris "grabbed her throat." According to Melissa, the woman "went down, but . . . didn't lose complete consciousness, but then [Paris] walked her out of the hotel room and she didn't come back." Melissa testified that this incident made her concerned about her own safety: "[i]f [Paris] can do it to her, he can do it to any of us."

Melissa testified that she felt that she had to obey Paris because "I didn't want to find out what would happen if I said no. I said no before and I got the temper and the anger, but I'd only been slapped a couple of times. And I seen what he did to the other girl."

Melissa testified that she was able to go home to New Hampshire from time to time, but that she also tried to leave Paris permanently three times. The first two times Melissa attempted to hide, but Paris found her and she went back to working for him. Melissa testified that Paris

---

[6] When Melissa first started working for Paris, Melissa's younger sister came to Hartford and met Paris. Melissa testified that later Paris said "if you're not around, there's always your sister."

slapped her after one of her attempts to leave.  On the third occasion, shortly after Melissa left

Paris, Martinez's bail bondsmen arrested her for violating her bail conditions.  When she was

arrested, Paris was present.  Melissa testified that she believed that Paris had arranged for her to

be arrested because Paris "had told [her] at one point that as long as [she] was working in

Connecticut, his state, that [she] was going to be working for him and nobody else."

Melissa testified that Paris used cell phones to talk to potential customers and drivers.

Melissa testified that Paris would write information about phone calls on a note pad that he kept

in his briefcase.

5.    Other Evidence

The Government also elicited testimony from five other witnesses.  Barry Perez

confirmed Melissa's account of the incident during which she believed Paris intended to kill her.

Kathleen Celotti testified that she and other women engaged in sexual intercourse for Paris's

personal financial benefit.

Michael Huchko testified that on several occasions he called Paris's phone number in

response to an advertisement in the Hartford Advocate newspaper, and arranged to meet a

woman for sexual intercourse.  Huchko testified that twice he used a credit card to pay for this

service.  Dennis Ireland testified that he also solicited prostitution in response to advertisements

in the Hartford Advocate, and that he twice called Paris's service.[7]  Ireland testified that he paid

for sexual intercourse using a credit card, but that the girl Paris provided looked young, scared,

and unwilling to engage in sexual intercourse; so Ireland left without having intercourse with the

_____

[7] Ireland testified that the first time he was not able to arrange a convenient time and
location with Paris.  The Government did not pursue Count Thirteen, which related to this
conduct.

girl.

Special Agent Chris Grispino of the Federal Bureau of Investigation testified that Paris made more than 20,000 telephone calls from his cellular telephone during the relevant time period, and that 2,000 of these phone calls were to out-of-state numbers. Grispino also pointed to the records of Huchko and Ireland's cellular telephone calls with Paris. Special Agent Douglas Werth of the Internal Revenue Service testified that Dennis Paris accepted credit card payments for his prostitution business and used credit card machines that utilized interstate wires, that the motels Paris used for his prostitution business were frequented by interstate travelers, and that the condoms Paris provided to his prostitutes were manufactured out of state. During the Government's rebuttal case, Grispino testified that Paris admitted operating a prostitution ring and that he provided condoms. Grispino also testified that Paris admitted that he used Melissa's outstanding warrants as threats to cause her to continue working for him.

Paris testified in his own defense, and elicited the testimony of Corrine L., who testified that she had never worked for Paris.

C.    Discussion

Paris argues that the Court should grant a judgment of acquittal with respect to each of the counts of conviction because the Government introduced insufficient evidence by which a rational jury could conclude that he was guilty. In particular, Paris maintains that the Government's evidence was insufficient to support his conviction on the conspiracy and sex trafficking counts. Paris also argues that the activity described in the sex trafficking counts is beyond the reach of Congress's power to legislate pursuant to the Commerce Clause.

1.  <u>Conspiracy</u>

Paris maintains that the Government's evidence was insufficient because it showed that Paris and Forbes were competitors rather than co-conspirators. According to Paris, the jury convicted Paris based on a conspiracy other than that charged in the Second Superseding Indictment.

The Government produced substantial evidence that Paris, Forbes, and Hicks conspired to use an interstate facility to promote prostitution: Melissa and Jennifer testified that, in late 2003, Forbes introduced them to Paris so that they could sell sex for money in sessions arranged by Paris for the benefit of both Paris and Forbes. Melissa testified that subsequently Forbes and Paris shared Melissa and Jennifer and shared the proceeds of calls. Melissa also testified that Paris and Forbes communicated with each other on cellular telephones to arrange calls for the girls. Finally, Jennifer and Melissa testified that Hicks aided Forbes in his prostitution business.

The Court instructed the jury that it could only convict Paris of the conspiracy charged in the Second Superceding Indictment:

> You must determine whether the conspiracy charged in the indictment existed, and, if it did, whether the defendant was a member of it between around November 2003 to around December 2003. If you find that the conspiracy charged did not exist, then you must return a not guilty verdict, even though you find that some other conspiracy existed. If you find that a defendant was not a member of the conspiracy charged in the indictment, then you must find that defendant not guilty, even though that defendant may have been a member of some other conspiracy.

The Court finds that the evidence offered by the Government was sufficient to permit a reasonable jury to conclude that Paris was guilty of the conspiracy charged in the Second

Superceding Indictment,[8] and that its instruction to the jury was sufficient to ensure that the jury did not convict Paris based on a different conspiracy.

### 2. Sex Trafficking

#### a. Congressional Authority to Enact 18 U.S.C. § 1591

Paris argues that Congress had no power to regulate sex trafficking where the recruiting, enticing, harboring, transporting, providing or obtaining of the trafficked person was performed intrastate, and thus that 18 U.S.C. § 1591[9] is unconstitutional as applied to him.

In United States v. Lopez, 514 U.S. 549, 115 S. Ct. 1624 (1995), the Supreme Court identified three categories of activity that Congress may regulate under the Commerce Clause:

First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate

---

[8] The Second Superceding Indictment reads: "From in or around November 2003 and continuing to around December 2003, in the District of Connecticut and elsewhere, defendants Dennis Paris, Brian Forbes, and Shanaya Hicks, did knowingly combine, conspire and confederate together, and with others known and unknown to the Grand Jury, to commit an offense against the United States, that is, to use and cause to be used, a facility in interstate commerce, that is cellular telephones, with the intent to promote, manage, establish, and carry on, and to facilitate the promotion, management, establishment, and carrying on, of an unlawful activity, specifically, a business enterprise involving prostitution offenses, in violation of the laws of the State of Connecticut, Connecticut General Statutes §§ 53a-82 and 53a-87; and further to thereafter perform and attempt to perform, acts to promote, manage, and carry on, and to facilitate the promotion, management, and carrying on of said unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3)."

[9] 18 U.S.C. § 1591(a) provides that "Whoever knowingly (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, or obtains by any means a person; or (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing that force, fraud, or coercion described in subsection (c)(2) will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b)." (emphasis added)

commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.

United States v. Lopez, 514 U.S. at 558-559 (internal citations omitted). Both the Government and Paris agree that the applicable test here is the third prong of Lopez.

      There are four relevant considerations in determining whether a law regulates an activity that has a substantial effect on interstate commerce. These are:

(1) the economic nature of the regulated activity;
(2) a jurisdictional element limiting the reach of the law to a discrete set of activities that additionally has an explicit connection with or effect on interstate commerce;
(3) express congressional findings regarding the effects upon interstate commerce of the activity in question; and
4) the link between the regulated activity and interstate commerce.

United States v. Gregg, 226 F.3d 253, 262 (3d Cir. 2000) cert. denied, 532 U.S. 971 (2001)

(citing United States v. Morrison, 529 U.S. 598, 610- 612, 120 S.Ct. 1740 (2000)).

      Section 1591 satisfies each of these considerations: First, commercial sex acts are economic in nature. Second, section 1591 has a jurisdictional element, requiring the jury to find that the activity affected interstate commerce. Third, in enacting the Trafficking Victims Protection Act, Congress found that "Trafficking in persons substantially affects interstate and foreign commerce." 22 U.S.C. § 7101 (b)(12). Fourth, as discussed more fully below, there is a clear nexus between Paris's intrastate recruiting and obtaining of women to commit commercial sex acts, the interstate aspects of Paris's business, and the interstate market for commercial sex. Cf. United States v. Evans, 476 F.3d 1176, 1179 (11th Cir. 2007) (finding section 1591 constitutional as applied to solely intrastate activities). Accordingly, the Court finds that it was within Congress's power to regulate Paris's intrastate recruiting and obtaining of women to

perform commercial sex acts.

b. Interstate Nexus for Sex Trafficking

_____Paris argues that while the Government produced substantial evidence indicating that his prostitution business involved considerable interstate contacts, this evidence was not sufficient to establish that his recruiting, enticing, harboring, transporting, providing, or obtaining women for that business itself affected interstate commerce.

At trial, the Government introduced evidence that (1) Paris made cellular telephone calls in connection with his business, (2) Paris accepted credit cards as payment for commercial sex acts and that the credit card processing machines used interstate wire connections, (3) Paris operated his business out of hotels frequented by out-of-state guests, and (4) Paris provided the victims with condoms that were manufactured out of state.

This, and other evidence presented by the Government, was sufficient for a reasonable jury to find that Paris's recruiting, enticing, harboring, transporting, providing, or obtaining women had a substantial affect on interstate commerce.[10]  First, procuring a women to engage in a commercial sex act contributes to an interstate market in commercial sex, even when the procuring occurred intrastate.  Cf. United States v. Evans, 476 F.3d at 1179-1180.  Second, as the Government's post-trial brief details, certain of Paris's activities, such as harboring women in hotels that served interstate travelers, had a direct impact on interstate commerce.  Third, the

_____

[10] The Court provided the following instruction to the jury on the interstate element: "If you find beyond a reasonable doubt that a defendant's recruitment, enticement, harboring, transportation, providing, or obtaining of a person for the purpose of engaging in a commercial sex act was economic in nature and involved the crossing of state lines, or was economic in nature and otherwise affected the flow of money in the stream of commerce to any degree, however minimal, you may find that the third element of the offense of sex trafficking has been satisfied." (emphasis added)

interstate aspects of Paris's business were inextricably linked to the intrastate aspects: Paris would not have needed to make cellular telephone calls, use hotel rooms, accept credit cards, or purchase condoms that had traveled in interstate commerce if he were not also recruiting, enticing, harboring, transporting, providing, or obtaining women to engage in commercial acts. See id. (holding that "use of hotels that served interstate travelers and distribution of condoms that traveled in interstate commerce are further evidence that [the defendant]'s conduct substantially affected interstate commerce.")

      c.      <u>Sex Trafficking of Eileen K.</u>

Paris argues that because of the inconsistency between Eileen's testimony and the testimony of Marianne and Corrine, a reasonable jury could not have found that Eileen worked for Paris.

The inconsistency between Eileen's testimony and the testimony of Marianne and Corrine was tangential to the core issues of (1) whether Eileen performed commercial sex acts for Paris and (2) whether he knew she was under eighteen at the time. Eileen testified that she worked for Paris and told him her age. Marianne confirmed that Eileen had worked for Paris. Both girls testified that they had done a call for Paris together. A reasonable jury could easily have concluded that Eileen was mistaken about the identity of Corrine's pimp, without being forced to conclude that Eileen was also mistaken about the identity of <u>her own</u> pimp. Similarly, a reasonable jury also could have reconciled Eileen's testimony with Marianne's. Accordingly, there was sufficient evidence from which a reasonable jury could have found that Eileen worked for Paris.

d.      <u>Sex Trafficking of Marianne C.</u>

Paris maintains that there was insufficient evidence that Paris knew that Marianne C. was under eighteen at the time she worked for him.[11]

Marianne testified that Paris had sex with her and saw her naked body in late 1999, when she was fourteen years old.  Paris also bought cigarettes for Marianne, knew that Marianne had young friends who were still in high school, and never asked Marianne for her identification. The Court gave the jury a "conscious avoidance" charge,[12] and a reasonable jury could have concluded that Paris either knew, or deliberately closed his eyes to the fact that Marianne was substantially younger than eighteen at that time.

Accordingly, Paris's motion for a judgment of acquittal is denied as to Count Four.

e.      <u>Sex Trafficking of Jennifer D.</u>

Paris maintains that Jennifer D. was not a credible witness and that there was no evidence that he used force, fraud or coercion to cause Jennifer D. to engage in a commercial sex act.

Melissa testified that when she and Jennifer first worked for Paris, they were shared by Forbes and Paris.  According to Jennifer, both men profited from their work performing commercial sex acts during this period.  Melissa and Jennifer both testified that Forbes kept them

---

[11] Section 1591 took effect October 28, 2000.  In order to be guilty of sex trafficking of Marianne C., Paris must have known that she was still under eighteen after that date. The Court instructed the jury that it could not convict Paris "based on conduct that occurred before October 28, 2000."

[12] "A conscious-avoidance charge is appropriate when (a) the element of knowledge is in dispute, and (b) the evidence would permit a rational juror to conclude beyond a reasonable doubt 'that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact.' " <u>United States v. Zedner</u>, 401 F.3d 36, 50 (2d Cir.2005) (citations omitted), <u>rev'd on other grounds,</u> --- U.S. ----, 126 S.Ct. 1976, 164 L.Ed.2d 749 (2006).

locked up and guarded, yelled at them, and was physically violent. According to Melissa, Forbes would withhold heroin from Jennifer and her if they were not working to Forbes's "standard," but still required them to work while suffering from drug withdrawal. Melissa testified that during this period she informed Paris of Forbes's treatment.

According to Jennifer, during the period when she worked exclusively for Paris, if she refused to do a call, Paris would withhold heroin from her, and cause her to become "drug sick." Jennifer also testified that Paris struck her in the face when she refused to do a call.[13] Jennifer testified that she felt that she could not leave Paris because she was afraid of him.

A reasonable jury could conclude from this that Paris recruited, enticed, harbored, transported, provided, and obtained Jennifer and benefitted financially from participation in a venture which has engaged in such acts knowing that force, fraud, or coercion would be used to cause her to engage in a commercial sex act.

f.      Sex Trafficking of Melissa P.

_____Paris maintains that there was no evidence that Paris used force to cause Melissa P. to engage in a commercial sex act.

As described above, the Government presented evidence that Paris arranged calls for Melissa and profited from her work, knowing that she was being abused and held hostage by Forbes at the time. Melissa testified that Paris promised to treat her well if she came to work for him. However, according to Melissa, Paris hit her when she displeased a customer, and she

---

[13] While Paris admitted that he slapped Jennifer, he testified that he did so for different reasons. On cross-examination, Jennifer did not explicitly deny that Paris hit her for reasons other than her refusal to work. A rational jury could credit Jennifer's explanation of reasons for the argument during which Paris hit her.

witnessed him abuse another woman during the time she worked for him. According to Melissa, the physical abuse she experienced and witnessed caused her to feel less able to leave Paris, and to fear the consequences she might incur if she disobeyed Paris or was caught attempting to escape. Melissa also testified that Paris threatened to cause Melissa's younger sister to work for him if she left. Finally Melissa testified that on one Paris caused her believe that he would murder her.[14]

Accordingly, the Court finds that the Government presented evidence from which a reasonable jury could conclude that Paris was guilty of the sex trafficking of Melissa by fraud, force, or coercion.

g.      Other Counts

The Court further finds that the Government presented sufficient evidence for a reasonable jury to convict Paris of use of an interstate facility to promote prostitution and money laundering. The Government elicited testimony from Huchko and Ireland that they called Paris's phone number to arrange commercial sexual intercourse (Counts Eleven, Twelve, and Fourteen through Twenty-one), and that they paid for this service with credit cards (Counts Twenty-two through Twenty-four). Paris stipulated that processing such credit card charges involved transmitting information over interstate telephone wires. Through Agent Werth the Government also introduced evidence that Paris deposited funds procured from his prostitution business into bank accounts and then withdrew the money to pay the expenses of that business, including hotel rooms and cellular telephone bills. Accordingly, Paris's motion for a judgment of acquittal is

---

[14] While Melissa never worked for Paris after this incident, and thus the incident did not cause Melissa to engage in commercial sex, the jury could have concluded that both Melissa and Paris expected her to continue working for him at the time.

denied in its entirety.

III.     Rule 33 Motion

Paris argues that he is entitled to a new trial because (1) he was not permitted to exercise peremptory challenges on the basis of gender; (2) the jury was not instructed that it was obligated to agree unanimously that either force, fraud, or coercion had been used to cause Jennifer D. and Melissa P. to engage in commercial sex acts; (3) coercion was defined too broadly; and (4) the terms "commercial sex act" and "fraud" are unconstitutionally vague.

A.     Standard

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33(a). "The rule by its terms gives the trial court 'broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.' " United States v. Ferguson, 246 F.3d 129, 133 (2d Cir. 2001) (quoting United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir.1992) (alterations by the Court)).  In exercising its discretion conferred by Rule 33, the Court may weigh the evidence and evaluate the credibility of witnesses.  Sanchez, 969 F.2d at 1413 (citing United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir.1980)).

The burden of persuasion is on the defendant to demonstrate that a new trial is appropriate.  United States v. Sasso, 59 F.3d 341, 350 (2d Cir.1995).  "Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.' " Ferguson, 246 F.3d at 134 (quoting Sanchez, 969 F.2d at 1414). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a

manifest injustice." <u>Ferguson</u>, 246 F.3d at 134.

      B.    <u>Discussion</u>

      1.    <u>Peremptory Challenges</u>

Paris argues that he should have been permitted to exclude jurors on the basis of gender. At jury selection, the Court ruled that Paris could not exclude jurors based solely on gender. Accordingly, Paris struck Juror 476, a male juror, from the panel. At the time, counsel for Paris indicated that he would not have used a peremptory challenge against this juror if he had been permitted to base it on gender.

In <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), the United States Supreme Court held that the Equal Protection Clause of the United States Constitution governs the exercise of peremptory challenges. In <u>Georgia v. McCollum</u>, 505 U.S. 42, 55 (1992), the Supreme Court reasoned that a criminal defendant's racially discriminatory exercise of peremptory challenges harms the individual juror and undermines public confidence in this country's system of justice. Thus, the Court held that the Equal Protection Clause also bars a criminal defendant from excluding jurors on the basis of race. In <u>J.E.B. v. Alabama</u>, 511 U.S. 127, 146 (1994), the Court found that <u>Batson</u> also applied to gender-based exclusion of jurors. In <u>J.E.B.</u> the Court rejected the argument that "women and men may have different attitudes about certain issues justifying the use of gender as a proxy for bias" and refused to "accept as a defense to gender-based peremptory challenges 'the very stereotype the law condemns.'" <u>J.E.B. v. Alabama ex rel. T.B.,</u> 511 U.S. 127, 138, n.9 (1994). <u>See also</u> <u>United States v. Martinez-Salazar</u>, 528 U.S. 304, 314-15 (2000) ("Under the Equal Protection Clause, a defendant may not exercise a peremptory challenge to remove a potential juror solely on the basis of the juror's <u>gender</u>, ethnic origin, or race."

(emphasis added)).  Taken together J.E.B. and McCollum prohibit a criminal defendant from exercising peremptories on the basis of gender.

Accordingly, the Court finds that its ruling barring Paris from exercising peremptories solely on the basis of gender did not produce a "manifest injustice."

2.    Unanimity

Paris argues that "force, fraud and coercion" are separate elements of the offense of sex trafficking, and thus that the jurors should have been instructed that they were required to reach a unanimous determination about which of these were used to cause Jennifer and Melissa to engage in commercial sex acts.

Jurors are required to unanimously conclude that the elements of an offense are satisfied, but are not required to unanimously agree on which means a defendant used to commit a particular element.  See e.g., Richardson v. United States, 526 U.S. 813, 817 (1999).  Force, fraud and coercion are alternate means to accomplish a single element.  See, e.g., United States v. Powell, No. 04-cr-885, 2006 WL 1155947, at *1 (N.D. Ill. Apr. 28, 2006) (holding that "fraud, force, or coercion" are means of accomplishing sex trafficking, not distinct elements); United States v. Marcus,  487 F. Supp.2d 289, 308 (E.D.N.Y.,2007) (describing "force, fraud, or coercion" as single element of § 1591); United States v. Jones, No. 1:05-cr-617, 2007 WL 2301420, at *6 (N.D. Ga., July 18, 2007) (same); United States v. Baggett, 251 F.3d 1087, 1096 (6th Cir. 2001) cert. denied 534 U.S. 1167, 122 S.Ct. 1184, 152 L.Ed.2d 126 (2002) (describing "force, coercion, duress, or fraud" as single element of interstate domestic violence offense); United States v. Helem, 186 F.3d 449 (4th Cir.), cert. denied, 528 U.S. 1053, 120 S.Ct. 595, 145 L.Ed.2d 494 (1999) (same).

Accordingly, the jurors were not required to unanimously decide which of force, fraud, or coercion Paris used to cause Jennifer and Melissa to commit commercial sex acts.

3. "Coercion"

The Court instructed the jury that "[t]he term 'coercion' means any threat of serious harm to or physical restraint against any person; or, any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or, any abuse or threatened abuse of law or the legal process." Paris contends that evidence that Paris threatened to report Melissa for outstanding arrest warrants or bond violations if she did not continue working for him did not constitute abuse of the legal process, but rather "good citizenship."

Legal coercion may include threats to use legitimate legal process to cause another to commit commercial sex acts the person otherwise would not have committed. Cf. United States v. Kozminski, 487 U.S. 931, 948, 108 S.Ct. 2751, 2762 (1988) (citing threatening immigrant with deportation as example of legal coercion that might cause involuntary servitude); United States v. Alzanki, 54 F.3d 994, 1005 (1st Cir. 1995) (threat to have domestic servant, who would have lost visa if discharged by employer, deported constituted legal coercion); Kimes v. United States, 939 F.2d 776, 777 (9th Cir. 1991) (threats to have illegal aliens deported constituted legal coercion). While it might have been lawful for Paris to threaten to report Melissa to authorities on legitimate arrest warrants, it was not lawful for him to refrain from doing so on condition that Melissa continue to perform commercial sex acts on his behalf. Furthermore, the Government presented substantial and credible evidence that Paris used other forms of fraud, force and coercion to cause Melissa to commit commercial sex acts.

Accordingly, the Government's evidence and argument that Paris used legal coercion to cause Melissa to engage in commercial sex did not cause manifest injustice.

       4.      <u>"Commercial Sex Act"</u>

Paris argues that the term "commercial sex act" is void for vagueness because it is broad enough to encompass even legitimate modeling or acting in a romantic movie. Section 1591 defines "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person," but does not define "any sex act."

Due Process requires laws be sufficiently clear to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and to "provide explicit standards for those who apply them." <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108-109, 92 S.Ct. 2294 (1972) (upholding antinoise ordinance that prohibited making noise that disrupted school sessiom). "In the absence of first amendment considerations, vagueness challenges must be evaluated based on the particular application of the statute and not on the ground that the statute may conceivably be applied unconstitutionally to others in situations not before the Court." <u>United States v. Coonan</u>, 938 F.2d 1553, 1561-1562 (2d Cir. 1991) (holding that "enterprise" element of RICO statute was not unconstitutionally vague as applied to defendant). The vagueness doctrine "is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." <u>Colten v. Kentucky</u>, 407 U.S. 104, 110 (1972) (upholding conviction for failure to disperse).

At trial, Marianne, Eileen, Jennifer and Melissa testified that the service they provided on

behalf of Paris was sexual intercourse, and that he knew that. Marianne testified that Paris showed her what her job would entail by having sexual intercourse with her. Marianne, Melissa, and Jennifer testified that Paris provided them with condoms. Melissa testified that Paris would inform her whether a client expected oral or vaginal intercourse and described specific incidents when Paris directed her to engage in vaginal or anal intercourse with customers. Two of Paris's customers also testified that they used Paris's service to arrange for sexual intercourse. Conversely, Paris testified that Paris Enterprises provided nude modeling and "body rubs," not prostitution services. Paris admitted that women working for him would have sexual intercourse with customers, but testified that this was not part of the service he provided. Instead, according to Paris, sexual intercourse was a private matter between the woman and the customer, and that women working for him would have sex with his customers for extra money or for enjoyment.

This case involves overwhelming evidence of sexual intercourse, and indeed Paris only denies that such intercourse was required. Accordingly, the conduct at issue in this case is within the heartland of the term "sex act" and Section 1591 provided fair warning that it applied to such conduct.

5.      "Fraud"

The Court instructed the jury that "'fraud' means any deliberate act of deception, trickery or misrepresentation." Paris maintains that the Court should have used the common law definition of fraud, and that without such a narrowed definition Section 1591 was unconstitutionally vague. At trial, the Government primarily presented evidence that Paris used force and coercion to cause Jennifer and Melissa to perform commercial sex acts. However, the Government also presented evidence that Paris initially induced Jennifer and Melissa to work for

him by promising to treat them well, pay them and supply them with drugs. This evidence of false promises falls within the ordinary understanding of fraud. The jury was entitled to evaluate this evidence along with evidence that Paris used force and coercion to determine that Paris compelled Melissa and Jennifer to perform commercial sex acts that neither would have otherwise been willing to perform.

Accordingly, the Court finds that Paris has not sustained his burden of demonstrating that the interests of justice require a new trial.

IV.     Conclusion

For the foregoing reasons, the defendant's Motion for Judgment of Acquittal or for a New Trial [Doc. # 514] is DENIED.


SO ORDERED this _23rd____ day of October 2007, at Hartford, Connecticut.


      /s/ Christopher F. Droney
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**