UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| UNITED STATES OF AMERICA | Criminal No. 3:06cr64 (JBA) |
|---|---|
| v. | August 17, 2023 |
| DENNIS PARIS | |

**RULING DENYING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE**

Defendant Dennis Paris moves for compassionate release under 18 U.S.C. § 3582 (c)(1)(A) on the grounds that his physical and mental health conditions, along with the COVID-19 pandemic, constitute extraordinary and compelling reasons warranting his release. (Mot. for Sentence Reduction under the First Step Act ("Def.'s Mot.") [Doc. # 812] at 1.) The Government opposes, contending that Defendant "provides no new evidence or information" to distinguish this motion from the prior motions for compassionate release, brought on the same grounds, denied by this Court most recently in April 2021. (Gov't's Opp'n to Def.'s Emergency Mot. for Compassionate Release ("Gov't's Opp'n") [Doc. # 821] at 1.) For the reasons that follow, Defendant's motion is DENIED.

**I. Background**

The Court assumes familiarity with the background of this case, more fully detailed in its prior order denying release under the First Step Act. (*See* Order Denying First Motion for Compassionate Release [Doc. #779].) Relevant here, Defendant was convicted by a jury of one count of conspiracy to use an interstate facility to promote prostitution, in violation of 18 U.S.C. § 371, two counts of sex trafficking of a minor, in violation of 18 U.S.C. § 1591, two counts of sex trafficking by force, fraud or coercion, in violation of 18 U.S.C. § 1591, and thirteen counts of use of an interstate facility to promote prostitution, in violation of 18 U.S.C. § 1952(a)(3). (Judgment [Doc. # 696] at 1.) On October 16, 2008, he was sentenced to a total of 360 months imprisonment, followed by three years of supervised release. (*Id.* at 1.)

Defendant first moved for Compassionate Release on May 12, 2020, on the basis that his underlying medical conditions and the danger of COVID-19 because of those conditions warranted his release. (Gov't's Opp'n at 1-2.) The Court held a hearing on his motion on November 18, 2020, hearing from both Defendant and one of his victims who objected to release. (*Id.* at 2.) The Court concluded that even though he would be at "severe risk" if he were to contract COVID-19, release was not warranted because Defendant "likely remains a danger to the community since he fails to recognize the true nature of his crimes and show remorse for the pain, he caused his victims." (*See* Order Denying Compassionate Release at 7.) The Court also denied the motion for reconsideration as well, reiterating his "apparent inability or unwillingness to take full and comprehensive responsibility for the reign of terror he imposed on young women he violently coerced into selling sex for his personal profit." (Ruling Denying Def.'s First Mot. for Recon. [Doc. # 796] at 6.) The motion currently before the Court is Defendant's second motion for compassionate release.

## II. Discussion

### A. Legal Standard

Defendant moves for release under 18 U.S.C. § 3582(c)(1)(A), which provides that:

> the court . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Although incarcerated persons previously could seek compassionate release only from the BOP, the First Step Act of 2018 permits federal prisoners to seek relief from the federal courts upon exhaustion of administrative rights. *See* 18 U.S.C. § 3582(c)(1)(A). In

"shift[ing] discretion from the [BOP] to the courts," the First Step Act brought about monumental change in an incremental way, paving the way for "the release of thousands of imprisoned people who[] did not need to be incarcerated" by "giving discretion to an appropriate decisionmaker," instead of "mandating more lenient outcomes." *United States v. Brooker*, 976 F.3d 228, 230 (2d Cir. 2020). By empowering district courts to reduce sentences and release prisoners, Congress intended to expand, expedite, and improve the process of compassionate release. *Id.* at 235 While a district court's discretion to grant compassionate release motions is extensive, a court cannot find extraordinary and compelling circumstances based on "rehabilitation *alone.*" *Id.* at 237-38.

### B. Extraordinary and Compelling Reasons

The Court assumes the parties' familiarity with Defendant's medical issues, which have been raised in prior motions; he suffers from morbid obesity and a BMI above 40, a chronic kidney disease (CKD) stage-2 that is no longer in remission, hypertension (obstructive) that he describes as "out of control", sleep apnea, amneoblastoma, vitamin D deficiency, and osteoarthrosis. (Def.'s Supp'l Mem. [Doc. # 819] at 2.) Defendant tested positive for COVID-19 after filing the pending motion, but "suffered no COVID" symptoms and reports no long-term complications from COVID-19. (*Id.* at 1.) Defendant initially refused a vaccine based on his health concerns, (*id.* at 3), but submitted a supplement on July 12, 2022 noting that he had received the Moderna vaccine after being informed by BOP doctors that he could receive it without undue danger arising from his pre-existing conditions. (Def.'s Supplement [Doc. # 822] at 1.)

Defendant is currently held in Otisville, New York at FCI Otisville and is scheduled to be released from Bureau of Prisons ("BOP") custody on November 28, 2031. *Find an Inmate*, FED. BUREAU OF PRISONS, https://www.bop.gov/inmateloc (last accessed August 1, 2023). At the time the motion was being briefed in March 2022, there were 16 positive cases among the inmates and 2 positive cases among the staff. (Gov't's Opp'n at 4-5.) Now, as of August 1,

3

2023, FCI Otisville is operating at a Level 1 operational level, which means that the medical isolation rate is less than 2% and there have been less than 100 new community positive cases per 100,000 over the last seven days. *COVID-19 Modified Operations Plan & Matrix,* FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp (last accessed August 1, 2023); *FCI Otisville,* FED. BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/otv/ (last accessed August 1, 2023). As of that same date, 895 inmates out of a total population of 1072 were vaccinated; 0 inmates were positive on that day. *BOP COVID-19 STATISTICS*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/covid19_statistics.html (last accessed August 1, 2023). 1 staff member was positive on that date, and 142 members of the staff were vaccinated. *Id.* Out of the 366 inmates who have tested positive at FCI Otisville, there has been one inmate death; there have been no staff deaths. *Id.*

Defendant's health conditions, while undoubtedly serious, are not significantly different from when he filed his first motion for reconsideration. The only significant changes that have since taken place since then are that he contracted COVID-19, recovered, suffered no long-term symptoms, and has been vaccinated. On the other hand, the COVID-19 infection rates at Otisville have fallen significantly while vaccination rates have risen. The threat of COVID-19 is "significantly mitigated" by vaccination, *United States v. Espinal*, No. 10-CR-74(JFB), 2021 WL 3566579, at *3 (E.D.N.Y. Aug. 12, 2021), and this Court has previously held that when an inmate has already contracted and recovered from COVID-19 and "does not claim to continue to experience any negative effects" any argument that risk of COVID-19 infection is an extraordinary and compelling reason for release is undermined when there is also a "diminishing" risk of reinfection due to "fellow inmates now being vaccinated." *United States v. Ricketts*, No. 3:16CR98 (JBA), 2021 WL 917068, at *1 (D. Conn. Mar. 10, 2021). Thus, given his level of protection against COVID-19 and the relatively low rates of COVID-19 in his

4

current facility, Defendant fails to demonstrate that there is currently a risk to his health from COVID-19 so great that it constitutes "extraordinary and compelling circumstances" warranting release.

### C. Section 3553(a) Factors

Even if Defendant demonstrated "extraordinary and compelling" circumstances, the Court finds that the § 3553(a) factors counsel against reduction of his sentence to home confinement. Under § 3553(a), a sentence must be "sufficient, but not greater than necessary" to

> reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense . . . to afford adequate deterrence to criminal conduct . . . to protect the public from further crimes of the defendant; and . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.* Given the relief requested here, the Court must also determine if Defendant is a "danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13; *see* 18 U.S.C. § 3582(c)(1)(A).

Far from demonstrating that he has reflected upon his crime of conviction, developed a respect for the law, and will be deterred from committing further crimes, Defendant and his counsel vigorously attempt to minimize the severity of his crime of conviction at every turn. (*See* Supp'l Mem. at 7) (attempting to distinguish Defendant's human trafficking crimes as "nothing like" human trafficking operations involving "shipping containers full of Asian and Eastern European girls held in near slavery for the sexual gratification of well-off customers" because the "prostitutes were free to stop working with Paris anytime they wanted and the evidence at trial established that all four of them did so with no brouhaha.")[1]

---

[1] Contrary to Defendant's assertions, "[b]y far the most pervasive myth about human trafficking is that it always - or often - involves kidnapping or otherwise physically forcing someone into a situation. In reality, most human traffickers use psychological means such as tricking, defrauding, manipulating or threatening victims into providing commercial sex or

5

While he admits that sex trafficking "is a very serious crime" and says he is "remorseful," (Def.'s Mot. at 36, 43), Defendant also attempts to frame the human trafficking Defendant engaged in as beneficial for his victims, who "made more through prostitution than they could in any other line of work available to them." (*Id.* at 7); (*see also* Def.'s Mot. at 48) (explaining that he gave two of the prostitutes working for him "money and they went shopping and spent the money however they wishes," and "could leave the hotel where they were staying and go out to a mall or go out to get something to eat.")

Defendant further minimizes the seriousness of his conduct and of the harm he inflicted by arguing that although one of his victims testified that Defendant struck her (and he admits in his motion to doing so), and another testified that he "tied her to a bed and threatened her," "no victim in this case died" or "even went to see a doctor." (*Id.* at 7.) If not for the police's intervention, Defendant claims that "the women," two of whom were minors, "probably would have continued to work as prostitutes." (*Id.* at 7-8.) Instead of acknowledging the seriousness of his offense, Defendant argues that because he "and his gaggle of prostitutes" did not commit as much harm as other individuals who have received compassionate release, and because Defendant's "slapping of Jennifer and his tying Melissa to a bed" pale in comparison to committing a murder, he is surely entitled to compassionate release if those who commit more violent crimes are.[2] Defendant's motion is silent, however,

---

exploitative labor." *Myths and Facts,* National Human Trafficking Hotline, https://humantraffickinghotline.org/en/human-trafficking/myths-facts (last accessed August 1, 2023).

[2] Defendant's supplemental memorandum states that "it is the undersigned who consistently denigrates the seriousness of the offense, not Defendant," and Defendant complains in his letter to the court that if his attorney "comments about certain feelings about these women . . . then he is representing his personal feelings toward that particular subject or situation," not Defendant. (Def.'s Mot. at 100.) However, a client is held responsible for the representations made by their lawyer, *see Bridge C.A.T. Scan Assocs. v. Ohio-Nuclear Inc.*, 608 F. Supp. 1187, 1197 (S.D.N.Y. 1985) ("[a] client and his attorney stand in the relationship of principal and agent. As such, a client may be responsible for statements made for the purpose of aiding, and within the scope of, his legal representation"), particularly when he fails to

as to whether he takes accountability for the harm these incidents caused, such as the testimony by one of his victims at the hearing that "she continues to be plagued by nightmares of her time with Defendant." (Order Denying First Mot. to Recon. at 7.) At most, Defendant states that he wrote a letter to the Court because "maybe you wanted to see in writing . . . the sorrow I feel for the victims of my crimes, and the guilt and remorse that I feel for the role I played in helping these females destroy their lives." (Def.'s Mot. at 94.) However, a handful of sentences in a 11-page letter primarily devoted to the difficulties that *he* has encountered in prison and why he believes his case for relief is stronger than that of his fellow inmates, does little to assure the Court that Defendant's sentiment is sincere and permanent.

At Defendant's sentencing before the now-retired Judge Droney, the Court remarked that "this was one of the most sad and disheartening cases that I have presided over" and lamented Defendant's "almost unspeakable cruelty and degradation." (Statement of Reasons [Doc. # 751] at 6.) Unfortunately, Defendant does not appear to have taken those words to heart. While his record in prison demonstrates an admirable engagement with prison programming and a commitment to avoiding disciplinary infractions, his filings do not paint the picture of a man overcome with remorse for his actions, much less a man for whom incarceration has fully served both its rehabilitative and deterrent purpose. Instead, his constant attempts to recast himself as a benefactor and protector to the very victims that he "coerced" into "sell[ing] their bodies for his profit" make painfully clear that he continues to be the same person who "appears to fail to grasp the depths of his depravity" who came

---

disavow those sentiments. As for counsel's admission that he is "denigrat[ing] the seriousness of the offense," counsel is reminded that his obligations under the Connecticut Rules of Professional Conduct include "maintaining a professional, courteous and civil attitude towards all persons involved in the legal system," which includes Defendant's victims; calling those victims Defendant's "gaggle of prostitutes" does not comport with that obligation, and further such language will not be tolerated by the Court. *See* Connecticut Rules of Professional Conduct, Preamble: A Lawyer's Responsibilities.

7

before the Court at his November 18, 2020 hearing. (Order Denying Mot. for Recon. [Doc. # 779] at 5-6.)

Thus, having considered the factors set forth in 18 U.S.C. § 3553(a) and U.S.S.G. § 1B1.13, the Court concludes that the nature and circumstances of the offense, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, the need to afford adequate deterrence to criminal conduct, and the need to protect the public from further crimes of the defendant all weigh against Defendant's release to home confinement.

### III. Conclusion

For the foregoing reasons, Defendant's Motion for Sentence Reduction under First Step Act [Doc. # 812] is DENIED.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 17th day of August 2023.